## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

|  |  |  |
|---|---|---|
| SAMUEL KARIM, | ) | |
| | ) | |
| *Plaintiff,* | ) | 14 C 1318 |
| | ) | |
| v. | ) | |
| | ) | Hon. Virginia M. Kendall |
| DR. SALEH OBAISI, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## MEMORANDUM ORDER AND OPINION

Plaintiff, Samuel Karim, is an inmate at Stateville Correctional Center ("Stateville") in

the custody of the Illinois Department of Corrections ("IDOC"). (Wexford SOF ¶ 1.)[1] He brings

this suit pursuant to 42 U.S.C. § 1983 for alleged deliberate indifference to his constitutional

rights. First, Karim claims that defendants Ada Johnson, Stanley Jenkins, Allen Hopkins, and

Joseph Panozzo, all employees of IDOC, were deliberately indifferent to his constitutional rights

by failing to maintain his cell in good living condition. (*Id.* ¶¶ 81–87.) Second, Karim brings a §

1983 claim against defendants Saleh Obaisi, Megan Pinas, Aveen Naqpal, and Marcus Hardy for

alleged deliberate indifference to Karim's medical conditions, which included a collapsed lung

and pneumonia. (*Id.* ¶¶ 88–94.) Third, Karim brings a § 1983 claim against defendants Kenneth

Brooks, Michael Lemke, Ricardo Tejeda, and Jacqueline Mitchell for deliberate indifference to

---

[1] The Court uses the following abbreviations throughout this opinion: "Wexford SOF" refers to Dkt. 119, Obaisi, Brooks, Pinas, and Wexford Health Sources' 56.1 Statement of Facts; "IDOC SOF" refers to Dkt. 123, Hardy, Johnson, Naqpal, Mitchell, Lemke, and Tejeda's 56.1 Statement of Facts; "Pl. IDOC Resp." refers to Dkt. 133, Plaintiff's response to the IDOC defendants' 56.1 Statement of Facts; "Pl. Wexford Resp." refers to Dkt. 135, Plaintiff's response to the Wexford defendants' 56.1 Statement of Facts; "Pl. IDOC SOAF" refers to Dkt. 133, Plaintiff's Statement of Additional Facts with respect to his claims against the IDOC defendants; "Pl. Wexford SOAF" refers to Dkt. 135, Plaintiff's Statement of Additional Facts with respect to his claims against Obaisi, Brooks, Pinas, and Wexford; "IDOC SOAF Resp." refers to Dkt. 146, the IDOC defendants' response to Plaintiff's Statement of Additional Facts; "Wexford SOAF Resp." refers to Dkt. 144, Obaisi, Brooks, Pinas, and Wexford's response to Plaintiff's Statement of Additional Facts.

Karim's dental needs stemming from an abscessed tooth. (*Id.* ¶¶ 95–101.) Finally, Karim brings a *Monell* claim against Wexford Health Sources ("Wexford"), alleging that the organization, which provides medical care to inmates at Stateville and acts under color of law, instituted policies and practices that created an environment in which employees did not respond to inmate's needs in an adequate or timely fashion, in violation of inmates' constitutional rights. (*Id.* ¶¶ 102–110.)

The following defendants now move for summary judgment: Johnson (cell conditions), Obaisi, Pinas, and Hardy (collapsed lung), and Brooks, Lemke, Mitchell, and Tejeda (abscessed tooth).[2] Wexford also moves for summary judgment, arguing that if its employees are entitled to summary judgment, then as a matter of law, it cannot be liable for an underlying constitutional violation. For the reasons set forth below, Defendants' Motions for Summary Judgment [118, 122] are both denied in part and granted in part.

---

[2] Defendants Jenkins, Hopkins, and Panozzo, three of the cell-conditions defendants, have not moved for summary judgment. Karim accuses them of (1) failing to repair a broken window in his cell, which led to his cell being exceedingly cold, (2) failing to provide him with a bed appropriate to his medical needs, and (3) failing to provide warm water in his cell. The operative complaint also alleges that Defendant Johnson was liable for these poor conditions. The parties agree, however, that the Court should enter summary judgment in favor of Johnson because there is no evidence that she was aware of any of Karim's cell condition complaints. (Dkt. 134 at 3; Dkt. 124 at 5.) Accordingly, the Court grants summary judgment in favor of Defendant Johnson. As none of the other cell-conditions defendants moved for summary judgment, those allegations are not substantively at issue for purposes of this motion.

The parties also agree that the Court should grant summary judgment in favor of Defendant Tejeda because no evidence demonstrates Tejeda's deliberate indifference to Karim's abscessed tooth. (Dkt. 134 at 4.) Accordingly, the Court grants summary judgment with respect to the dental claim against Tejeda.

The parties also agree that the Court should grant summary judgment in favor of Defendant Hardy. (Dkt. 134 at 2.) The record does not indicate that Hardy had any personal involvement or knowledge of any lung issue. Accordingly, the Court grants summary judgment in favor of Hardy.

After initially moving for summary judgment, Defendant Naqpal, a medical provider who saw Karim in response to his complaints of chest pain, withdrew his motion for summary judgment. (Dkt. 147 at 2.)

<u>**FACTS**</u>

The following facts are undisputed unless otherwise indicated.

**a. Abscessed Tooth**

On May 17, 2012, Karim attended a regularly scheduled bi-annual dental appointment with Dr. Kenneth Brooks, a dentist employed by Wexford who treated inmates at Stateville. (Wexford SOAF Resp. ¶ 63; IDOC SOF ¶ 9.) At that appointment, Dr. Jacqueline Mitchell, the Lead Dentist at Stateville and an IDOC employee, also saw Karim, and ordered a series of routine x-rays. (Dkt. 144-2 at 1.) Those x-rays did not reveal any pathology. (*Id.*) However, the dentists scheduled Karim for another appointment on July 5, 2012, in order to fit Karim with a nightguard and adjust the filling on his number eighteen tooth. (*Id.*) At Karim's July 5 appointment, Dr. Brooks discovered a possible periapical abscess (an infection of the tooth) on tooth eighteen. (Wexford SOF ¶ 27.) Brooks later confirmed that this was a localized buccal abscess,[3] which he believed antibiotics and painkillers could control for several weeks. (Wexford SOF ¶ 31.) Brooks prescribed a one-week course of Motrin (pain medication) because abscesses frequently become painful, as well as a one-week course of penicillin (an antibiotic) to keep the abscess from growing. (Wexford SOF ¶ 29; Pl. Wexford Resp. ¶ 29; Dkt. 119-5 at 34:16–35:1.) Karim took the medication, which reduced the pain in his mouth. (Wexford SOF ¶ 29.) However, extraction is the ultimate treatment for this sort of abscess. (*Id.* ¶ 32.) As such, Dr. Brooks scheduled Karim for a follow-up appointment on September 17, 2012, more than two months after his initial appointment and long after his antibiotics and pain medicine ran out.[4] (*Id.* ¶ 34.)

---

[3] The parties dispute whether the abscess was acute or chronic on July 5, 2012. Karim's expert reviewed Karim's chart and determined it was an acute abscess. (IDOC Ex. G at 5.) Dr. Brooks believes it was a chronic abscess. (Dkt. 119 at 78:17–19.) If it was chronic, it was not an emergency and could be treated with antibiotics for a time before eventually being extracted. (Wexford Ex. JJ at 2.)

[4] Wexford admits that scheduling Karim for a follow-up appointment more than two months after the abscess diagnosis was "not ideal." It insists, however, that it was the earliest available appointment. (Wexford SOAF Resp. ¶ 70.)

Karim did not appear for this appointment, so Dr. Mitchell, the dentist with whom Karim had the appointment, rescheduled Karim for September 19, 2012. (*Id.* ¶¶ 36–37.) However, Karim also missed that appointment. (*Id.* ¶ 38.) According to Karim, he did not show up for these appointments because nobody notified him about them. (Pl. Wexford Resp. ¶ 37–38.) It is undisputed, however, that Dr. Mitchell prepared a call-line pass for the dental appointments on September 17 and September 19.[5] (*Id.* ¶ 39.) Karim's patient record indicates that following the second missed appointment, Dr. Mitchell sent a "refusal form" to Karim, on which he could indicate whether he chose not to receive dental care.[6] (Wexford SOF ¶ 40; Wexford Ex. E, IDOC 129.) Karim did not return this form (*Id.* ¶ 40), and claims that he never received it. (Pl. Wexford Resp. ¶ 40.) Dr. Mitchell also called Karim's cell house to inquire as to why Karim missed his appointments, but received no explanation. (Dkt. 119-5 at 90:22–92:18.)

On February 18, 2013, Karim wrote a letter to the Dental Unit[7] requesting an appointment to have a dentist care for his painful abscessed tooth. (Pl. SOAF ¶ 72.) There is no evidence that the Dental Unit ever received this letter. (Wexford SOAF Resp. ¶ 72.) On March 21, 2013, Karim wrote another letter to the Dental Unit informing them that he still had not been seen for his abscessed tooth. (Pl. SOAF ¶ 73.) He added: "I'm in pain please help me." (*Id.*) As with the first letter, there is no evidence that the Dental Unit ever received this second letter. (Wexford SOAF Resp. ¶ 73.) On May 15, he wrote a third letter on the same topic, but again there is no evidence that the Dental Unit ever received this letter either. (Wexford SOAF Resp. ¶ 74.) Mitchell indicated in her deposition that the letters were not marked "received," and it was

---

[5] A call-line pass is a document that inmates receive giving them permission to attend scheduled appointments. (Dkt. 119-5 at 87:8–88:1.)

[6] Wexford uses these forms so that they can document when a prisoner refuses treatment, so that the prisoner cannot later claim that Wexford denied care.

[7] Dr. Mitchell, an IDOC-employed dentist, supervises all the dentists in the Dental Unit, some of whom are employed by Wexford.

her practice to write that on all requests for treatment she received from inmates. (Dkt. 119-5 at 62:13–68:9.) Karim testified that on or before June 25, 2013, he spoke to Mitchell in person, described his abscess, and requested that she put him on the schedule to get treatment. (Pl. IDOC SOAF ¶ 104.) His contemporaneous grievances also reference a discussion with Mitchell, although Mitchell did not recall speaking with Karim. The Dental Unit did not place him on the schedule following this conversation. (*Id.*)

Karim also filed an emergency grievance in July 2013 with the office of the warden, Michael Lemke, regarding his dental problems. (Dkt. 135-14.) Lemke's staff reviewed the document (Lemke himself never did), and determined that the dental issue did not constitute an emergency. As such, the warden's office did not order expedited dental care for Karim. (*Id.*; Dkt. 123-4 at 74:10–23.)

On July 29, 2013, Karim filed an emergency grievance with the Dental Unit requesting immediate attention, as his tooth was bleeding and exuding pus. (Wexford SOAF Resp. ¶ 75.) On August 1, 2013, almost one year after his initially scheduled extraction, the Dental Unit received the grievance and scheduled Karim for an appointment on August 6, 2013. (Pl. SOAF ¶ 77.) At the August 6 appointment, another dentist discovered that the abscess had eroded the bone around Karim's tooth and gave him some medication and scheduled him for an extraction on August 8. (*Id.*) That appointment was rescheduled, however, due to a prison lockdown. (*Id.* ¶ 78.) According to Karim, he saw warden Lemke before the August 8 appointment and showed him the abscess, but Lemke refused to allow him to attend his appointment due to the lockdown. (Pl. SOAF ¶ 116.) Lemke acknowledges that he had the authority to permit inmates to attend appointments during lockdowns, but he does not recall this conversation or seeing the abscess.

(*Id.* ¶ 113; IDOC SOAF Resp. ¶ 117.)) On August 23, 2013, Dr. Mitchell prescribed additional medication before extracting the tooth on August 26. (Dkt. 119-5 at 56:6–24.)

### b. Collapsed Lung

On November 11, 2012, a Certified Medical Technician and IDOC employee, Defendant Aveen Naqpal saw Karim in response to his complaints of difficulty breathing and chest pain. (Pl. Wexford SOAF ¶ 48.) According to Karim, he informed Naqpal that he was feeling bad and wanted to be seen by a medical professional. (*Id.*) Naqpal gave Karim some cold medication. (IDOC SOF ¶ 13.) Karim did not see another medical professional until November 17, six days later. (Pl. Wexford SOAF ¶ 48–49.)

On November 14, 2012, Karim wrote a letter to Dr. Obaisi, a doctor employed by Wexford at Stateville indicating that he was experiencing shortness of breath and pain in his chest. (Wexford Pl. Resp. ¶ 16.) Obaisi, however, does not read letters from inmates, as letters are not a recognized method of communication between prisoners and healthcare providers at Stateville. (Wexford SOF ¶ 16.) Like all letters from inmates, Obaisi did not receive or read the letter from Karim. (*Id.*) There was a policy in place whereby nurses screened such letters and would ask doctors questions about them if they determined that was necessary. (Dkt. 119-5 at 43:3–17.) Obaisi does not recall a nurse ever approaching him with regard to a grievance letter from Karim. (*Id.*)

On November 17, 2012, at 2:50 a.m., Nurse Megan Pinas, a Wexford employee saw Karim in the "cell house." (Pl. Wexford Resp. ¶ 8.) Karim complained of difficulty breathing and pain in the center of his chest. (*Id.*) At that time, his pulse oximeter reading was 93% and his respiration rate was eighteen. (Wexford SOF ¶ 9.)[8] According to Pinas's report, Karim did not

---

[8] Eighteen is a normal respiratory rate. (Wexford SOF ¶ 12.) A 93% oximetry reading may be normal, or slightly below normal, depending on the patient.

show signs of distress and he was not gasping for breath. (Dkt. 119-4 at 53:14–22.) Pinas believed that Karim had a serious medical condition, but not a critical one. (*Id.* at 63:21–24.) As such, she provided Karim with Tylenol, requested that Karim return to his cell to lie down, and indicated that she would continue to monitor him, but did not listen to his chest. (Wexford SOF ¶ 10.)

Nurse Pinas saw Karim again at 5:35 a.m. that same morning. (*Id.* ¶ 12.) At that time, his pulse oximeter reading had increased to 95% and his respirations remained constant at eighteen, both of which are normal. (*Id.*) At this meeting, she scheduled Karim for a same-day sick-call with a doctor but did not listen for breath sounds. (*Id.* ¶ 13.)

Later that same day at 9:25 a.m., a nurse initially saw Karim at sick call. (*Id.* ¶ 14.) Karim's vital signs at that time indicated an oximetry reading of 93%, and an elevated respiratory rate of twenty-two. (*Id.*) Shortly thereafter, Obaisi examined Karim and noted no breath sounds on the right side of Karim's chest and began administering oxygen. (*Id.* ¶ 15.) Obaisi then spoke to an emergency room physician at St. Joseph's Hospital before ordering that Karim be transferred to St. Joseph's emergency room. (*Id.*)

Later that same morning, Karim was admitted to the emergency department at St. Joseph's Hospital in stable condition. (*Id.* ¶ 21.) The emergency room physician diagnosed Karim with a spontaneous pneumothorax (collapse) of the right lung. (*Id.* ¶ 22.) The pneumothorax appeared to be developing into a tension pneumothorax, which necessitated the insertion of a chest tube into his lungs. (Pl. Wexford Resp. ¶ 22.) Karim ended up spending three days at St. Joseph's Hospital before being transferred to the University of Illinois Hospital, where he spent an additional two days. (Pl. Wexford SOAF ¶ 62.)

## LEGAL STANDARD

On a motion for summary judgment, the Court views the evidence and draws all reasonable inferences in favor of the non-moving party. *Burton v. Downey*, 805 F.3d 776, 783 (7th Cir. 2015). Summary judgment is proper only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A factual dispute is genuine if a rational trier of fact could return a verdict for the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Where two parties tell two different stories, one of which has no support in the record, the Court does not adopt the unsupported version of the facts for purposes of ruling on a motion for summary judgment. *Id.*

## DISCUSSION

In order to prevail on an Eighth Amendment claim for deliberate indifference to serious medical needs, an inmate must demonstrate that he suffered from an objectively serious medical condition and that the defendant was deliberately indifferent to a risk of serious harm stemming from that condition. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011.) A serious medical condition is "one that a physician has diagnosed as needing treatment or 'one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009) (quoting *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). Deliberate indifference is a mental element that requires "more than negligence or gross negligence, but less than purposeful infliction of harm." *Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003); *see also Proffitt v. Ridgway*, 279 F.3d 503, 506 (7th Cir. 2002) (deliberate indifference to a prisoner's safety implies avoidance of a known risk, not merely a foreseeable one). Additionally, a defendant can be held liable under § 1983 only if he was

personally involved in the conduct that led to a deprivation of constitutional rights. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). In short, the deliberate indifference standard requires that the defendant knew about the conduct that deprived the plaintiff of his rights, condoned that conduct, facilitated it, approved of it, or turned a blind eye to it. *Arnett*, 658 F.3d at 757.

Prisoners are entitled to adequate medical care. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). There are not entitled, however, to "unqualified access to care." *Holloway v. Del. Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). A medical professional will only be held liable under the deliberate indifference standard if she makes a decision that is "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)). Ultimately, the "decision of a medical professional to do nothing, even though she knows that a patient has a serious medical condition requiring prompt treatment that the professional is capable of and responsible for providing, amounts to deliberate indifference." *Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 940 (7th Cir. 2015).

## A. Dental Claim

Karim claims that Dr. Mitchell (an IDOC dentist) and Dr. Brooks (a Wexford dentist) were deliberately indifferent to his dental needs by failing to treat his tooth abscess, a serious medical condition, in a timely fashion. He also claims that the then-warden of Stateville, Lemke, was deliberately indifferent to Karim's dental needs by failing to respond with urgency to Karim's grievances regarding his bloody and pus-excreting tooth, and by not allowing Karim to attend his August 8, 2013 dental appointment due to a prison lockdown. Brooks moves for

summary judgment, arguing that his decision to schedule Karim for a follow-up appointment on September 17 was not a substantial departure from accepted professional standards, and as such, he was not deliberately indifferent to Karim's dental needs. Mitchell moves for summary judgment on the grounds that she treated Karim's condition appropriately and that the undisputed record indicates that she was not deliberately indifferent to Karim's dental needs. Lemke moves for summary judgment on the grounds that he had no knowledge of Karim's dental complaints, and that he was not a dental professional capable of determining whether urgent medical treatment was necessary.

A prison dentist is deliberately indifferent by failing to treat a prisoner's painful abscess promptly, thereby "prolonging the patient's pain while knowing that the patient may well be in serious pain that is treatable." *Id.* In *Dobbey*, the same Dr. Mitchell failed to treat a prisoner's abscessed tooth for sixteen days from the date on which a prison medical technician discovered the plaintiff's abscessed tooth. *Id.* at 939. Over the course of those sixteen days, the plaintiff was in pain, but the Dental Unit canceled two of his appointments for treatment without providing a satisfactory explanation for the cancelations. *Id.* Accordingly, the Seventh Circuit overturned the district court's grant of summary judgment in favor of the defendants because the record demonstrated sufficient evidence of deliberate indifference so as to create a jury issue.[9] *Id.* at 941.

Given the decision in *Dobbey*, in which a sixteen-day delay in treating an abscess was sufficiently indicative of deliberate indifference to preclude summary judgment, Brooks decision

---

[9] In *Dobbey*, the plaintiff suffered from an acute abscess (*Dobbey v. Mitchell-Lawshea*, No. 12 C 1739, 2014 WL 702352, at *7 (N.D. Ill. 2014), *overruled by* 806 F.3d 938), which requires more immediate treatment than a chronic abscess. A chronic abscess can be treated with medication. In the instant action, the parties dispute whether Karim's abscess was acute or chronic. Karim and his expert claim it was acute and that Karim therefore experienced pain from the onset. Brooks clams it was chronic and asymptomatic and that medication could therefore treat the abscess temporarily.

to schedule Karim's follow-up more than two months after his abscess diagnosis may also qualify as deliberate indifference. Here, however, Dr. Brooks provided initial treatment, and there is a fact dispute about whether Karim informed Brooks that he was in pain at his July 5 appointment. Providing Karim with Motrin and penicillin initially meets the standard of care, but only providing a week's supply and not scheduling Karim for over two months could constitute deliberate indifference. *See Dobbey*, 492 F.App'x. at 940. Prescribing Motrin also supports Karim's contention that he informed Brooks that he was in pain on July 5. Brooks claims that scheduling constraints made it impossible to schedule Karim to come in sooner to have the abscess removed, but Brooks admits that he was able to schedule urgent appointments more quickly. (Dkt. 119-3 at 125:16–126:5.) Thus, multiple genuine disputes of material fact remain that preclude granting summary judgment in favor of Brooks, including: 1) whether Brooks was aware that Karim was in pain at the July 5 appointment (the dental records from that day do not indicate that he was, but Brooks prescribed pain medication, and Karim claims he was in pain at that point), 2) whether scheduling constraints at the prison were so restrictive as to make it impossible to schedule Karim in sooner, and 3) whether there was any medically sound reason for Brooks' failure to renew the antibiotic and pain medication beyond the one-week period. Accordingly, the Court denies summary judgment as to Defendant Brooks.[10]

As for Dr. Mitchell, her initial involvement in this matter was attempting to discern why Karim failed to attend his first September appointment, rescheduling the appointment for two days later, and sending out a refusal form to Karim after he missed the second appointment. Karim also claims that Mitchell was deliberately indifferent by failing to address his dental needs

---

[10] Brooks and the other Wexford defendants attempt to escape liability by invoking qualified immunity. However, qualified immunity does not apply to private medical professionals working in prisons. *Petties v. Carter*, 836 F.3d 722, 734 (7th Cir. 2016) (citing *Shields v. Ill. Dep't of Corrections*, 746 F.3d 782, 794 (7th Cir. 2014). This defense therefore fails with respect to Brooks.

after sending several letters to Mitchell and the Dental Unit and then an in-person encounter in June 2013, where he requested treatment directly from Mitchell. Karim also claims that after his extraction appointment was canceled on August 8, 2013, due to a prison lockdown, Mitchell was deliberately indifferent by waiting to schedule his appointment until August 20, almost two weeks later.

Dr. Mitchell was not deliberately indifferent to Karim in September 2012. The undisputed record demonstrates that she was not involved or aware of the decision to schedule his original extraction more than two months after the abscess was identified; as discussed above Dr. Brooks made that decision. Once Mitchell learned that Karim failed to attend his appointment on September 17, 2012, she attempted to reschedule his appointment for two days later and then inquired as to why he missed his appointments, including by sending a refusal form. Just because Dr. Mitchell's diligent efforts to reach out to Karim in September 2012 regarding his treatment were not successful, does not make her actions deliberately indifferent. *See Zirko v. Ghosh*, No. 10 C 08315, 2015 WL 6447768, at * 13–14 (N.D. Ill. Oct. 26, 2015) (granting summary judgment in favor of a prison doctor who rescheduled an MRI for two days after the initial appointment because that appointment "timeline is hardly a description of deliberate indifference"); *Boyce v. Exec. Dir. of Cook Cty. Dep't of Corr.*, No. 96 C 3703, 2001 WL 648951, at *11 (N.D. Ill. June 4, 2001) (noting that "a mere negligent failure to follow-up on plaintiff's medical treatment will not support a finding of deliberate indifference"). To the extent Karim submits that Mitchell was deliberatively indifferent because he was not informed of the appointments or not provided the refusal form, that claim would be more appropriate against a jail policymaker, instead of Dr. Mitchell. *See, e.g., Talley v. Dart*, No. 08 C 5485, 2012 WL 1899393, at *9 (N.D. Ill. May 24, 2012).

Karim's requests for dental treatment between September 2012 and August 2013, however, present a triable issue for Dr. Mitchell. While there is no indication in the record that Dr. Mitchell ever read or even received the letters Karim wrote to her in 2013, there is a dispute of fact as to whether Karim informed Mitchell in person regarding his abscess and requested treatment from her on June 25, 2013.  Although Mitchell does not recall the conversation, Karim's affidavit and contemporaneous grievances reference such a conversation with Mitchell, where he reminded her of his abscess and requested treatment.  As a result of this conversation, when viewing the evidence in the light most favorable to Karim, a jury could infer that Mitchell was aware that Karim had a serious condition in June 2013 and took no action to remedy it until August 2013 when she received a grievance. Such action could constitute deliberate indifference. *Dobbey*, 492 F.App'x. at 940.

Although it is undisputed that Karim's August 8, 2013 dental appointment was canceled due to the lockdown, the record is inconclusive on why Mitchell rescheduled Karim's dental appointment for August 20, almost two weeks after his extraction was set.  There is no evidence regarding the length of the lockdown or whether Karim could have been seen earlier.  When viewing the evidence in the light most favorable to Karim, a jury could infer that his 12 day delay resulted from Mitchell's deliberate indifference to Karim's medical condition. *Dobbey*, 492 F.App'x. at 940.

Although the undisputed record indicates that Dr. Mitchell was not deliberately indifferent to Karim's dental needs in September 2012, fact issues preclude summary judgment in favor of Dr. Mitchell as to the delay of treatment in between September 2012 and August 2013 and the delay in rescheduling his August 8 tooth extraction.

Finally, Warden Lemke argues that he cannot be liable for deliberate indifference because he was not personally involved in any decision that led to a deprivation of Karim's constitutional rights. Although it is true that "the Warden of each prison . . . is entitled to relegate to the prison's medical staff the provision of good medical care," *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009), if a prison official, like Lemke, has a reason to believe, or actual knowledge that the prison's medical staff are mistreating or failing to treat a prisoner, the prison official may be liable for deliberate indifference. *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008) (finding non-medical prison official was not deliberately indifferent to prisoner's serious medical condition when the defendants investigated the complaints and referred them to appropriate medical personnel).

When viewing the facts in the light most favorable to Karim,[11] even when putting aside Karim's grievances and communications, Lemke had actual knowledge of Karim's abscess and appointment on August 8 and refused to allow Karim to attend his appointment. Thus, he was personally involved in deciding that Karim would not get the treatment that medical professionals determined he needed on that day. Lemke argues that because of the lockdown he could not get Karim the needed treatment, yet his own testimony makes clear that prisoners with serious medical issues could be seen by doctors and dentists during a lockdown. Further, "[w]hile prisoner freedoms may be reasonably restricted at the discretion of prison officials during lockdowns, prisoner's constitutional right to have serious medical conditions treated is not suspended." *Hardy v. Wexford Health Sources, Inc.*, No. 12 C 6554, 2015 WL 1593597, at *15 (N.D. Ill. 2015). Thus, Lemke's decision to not grant Karim leave to get treatment during a lockdown may constitute deliberate indifference because according to Karim, Lemke saw the

---

[11] For purposes of this motion, the Court views the evidence in the light most favorable to Karim, and therefore assumes that a meeting between Karim and Lemke took place on August 8, at which Karim showed Lemke the abscess and informed him of the appointment, and Lemke refused to grant Karim leave to go to the appointment.

abscess on August 8th, understood it to be a serious condition, yet refused to allow Karim to attend the appointment to receive treatment. This is especially so because according to Karim, at the time he saw Lemke on August 8, the abscess was so grotesque that even a layperson like Lemke would have understood that Karim required urgent dental care. *See Vance*, 97 F.3d 987; *Reed v. McBride*, 178 F.3d 849, 854 (7th Cir. 1999). Accordingly, the Court denies IDOC's motion for summary judgment with respect to Lemke.

## B. Medical Claim

Karim claims that Nurse Pinas and Dr. Obaisi, both Wexford employees, failed to provide appropriate care to treat his collapsed lung. Their failure to do so, he alleges, is indicative of their deliberate indifference to his medical needs. Wexford moves for summary judgment, arguing that: 1) Pinas was not aware that Karim had a serious medical condition that her medical treatment of him does not evidence deliberate indifference and 2) that Obaisi provided appropriate care once he discovered the lack of breathing sounds on the right side of Karim's chest.

Neither a minor delay in treatment nor an inmate's disagreement with a physician's recommended course of treatment constitutes deliberate indifference. *Barry v. Peterman*, 604 F.3d 435, 442 (7th Cir. 2010); *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007). Where a delay in treatment is minimal and has no adverse consequences, the medical provider responsible for that delay is not deliberately indifferent. *See Knight*, 590 F.3d at 466. Where a plaintiff may wish he had received a different course of treatment, his dispute with the medical professional does not rise to the level of an Eighth Amendment issue. *Snipes v. Detella*, 95 F.3d 586, 591 (7th Cir. 1996). Whether a medical professional provided the correct treatment is a question of tort law, not a constitutional one. *Id.*

The undisputed record shows that Nurse Pinas was not deliberately indifferent to Karim's medical condition. First, as Dr. Obaisi testified, a pneumothorax is difficult even for physicians to diagnose (Wexford SOF ¶ 20); the fact that Nurse Pinas did not diagnose it does not indicate her deliberate indifference. At the time she evaluated Karim, although he complained of chest pain and difficulty breathing, he was alert, was not gasping breath, and was not in distress. Although Pinas recognizes Karim's condition was in her words, "serious," she did not believe it was a critical situation that needed the intervention of a doctor. Instead, she monitored him closely, checked his vital signs, and scheduled an appointment for him to see the doctor only hours after she first saw him. Given that Karim's oximetry and pulse readings were not abnormal, the fact that he showed no signs of distress, and the difficulty in diagnosing a pneumothorax, there is insufficient evidence for a jury to infer that Nurse Pinas's medical care for Karim was deliberately indifferent.

Even if Pinas made a medically unreasonable decision by monitoring Karim and scheduling him for sick call instead of immediately informing a doctor, that decision, as in *Knight*, constituted a short delay, which had minimal or no adverse consequences on Karim's health. *Knight*, 590 F.3d at 466 (a two-and-a-half hour delay in treatment of the plaintiff's shoulder injury "was minimal and had no adverse consequences"); *see also Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999) (deliberate indifference describes actions that are so dangerous that the deliberate nature of them can be inferred); *Snipes*, 95 F.3d at 590 ("the Eighth Amendment is not a vehicle for bringing claims for medical malpractice."). Karim relies on *Gil v. Reed*, 381 F.3d 649 (7th Cir. 2004), in support of the proposition that Pinas's delay in diagnosing and treating his collapsed lung is indicative of her deliberate indifference. That case is inapposite. In *Gil*, a physician's assistant refused to provide the plaintiff with pre-prescribed medication. There

was no diagnosis at issue in that case. Summary judgment was not warranted in *Gil* because the physician's assistant knew about the condition (given that there was a prescription) and refused to act upon that knowledge. Here, there is no evidence of such knowledge. Karim claims that Pinas's failure to listen to Karim's chest (which is disputed) was unreasonable. Even if that decision were unreasonable, unreasonable behavior on the part of a practitioner falls within the realm of malpractice; it is not indicative of deliberate indifference. *See Duckworth v. Ahmad*, 532 F.3d 675, 679 ("[d]eliberate indifference is not medical malpractice"); *Gayton*, 593 F.3d at 623–24.

Further, nothing in the record indicates that Pinas based her decision to place Karim under close observation but not send him to an emergency appointment on anything other than her professional judgment. *See Gayton v. McCoy*, 593 F.3d 610, 622–23 (7th Cir. 2010) (affirming grant of summary judgment on a deliberate indifference count in favor of correctional nurse who did not ensure that an inmate with chest pains received immediate attention from a doctor, but used her professional judgment to give the inmate medication and put the inmate on a list to see a doctor shortly thereafter). Karim relies on a different ruling in *Gayton* regarding Nurse Hibbert, whereas the Court refers to *Gayton*'s ruling with respect to Nurse Radcliff. In contrast to the court's holding with respect to Nurse Radcliff, the Seventh Circuit also ruled that summary judgment was not appropriate in favor of Nurse Hibbert because she refused to see a vomiting inmate because her shift was almost over. *Gayton*, 593 F.3d at 623–24. In *Gayton*, Nurse Radcliff, who was granted summary judgment, did not provide stellar treatment in that she failed to check the patient's vital signs and failed to follow protocol to contact a doctor when the patient complained about chest pain, but because her treatment did not depart so substantially from the professional norm as to be deliberately indifferent, as evidenced by her bringing the

inmate's issues to the attention of a doctor and taking steps to ensure the inmate got proper medication, summary judgment in her favor was appropriate. *Id.* Here, Nurse Pinas's role in treating Karim is analogous the role Nurse Radcliff played in *Gayton*, where summary judgment was appropriate. Karim also claims that Pinas violated protocol, and that her violation of protocol is indicative of deliberate indifference. However, Karim fails to cite any protocol that has been violated and as discussed above, in *Gayton*, a nurse's violation of protocol did not preclude summary judgment in her favor.Karim has failed to establish that Pinas acted with the relevant mental state necessary to sustain a deliberate indifference claim, that her judgment departed so substantially from the professional norm that she acted deliberately indifferent to Karim's health, or that her delay of a few hours in getting a doctor to attend to Karim had any adverse effect on his health. As such, the Court grants summary judgment in Pinas's favor.

Karim's primary argument for how Obaisi was deliberately indifferent at his sick appointment is that it took Obaisi thirty minutes from the time Karim arrived for his appointment before Obaisi ordered him transferred to the emergency room. There is no indication in the record, however, that any decision Obaisi made regarding Karim's treatment was outside the bounds of accepted professional standards. The undisputed record indicates that any minor delay identified by Karim, was in fact Obaisi diagnosing Karim and contacting the emergency room to make sure it would accept an inmate. That it took Dr. Obaisi some time to organize a treatment plan for Karim does not indicate his deliberate indifference. Furthermore, once Obaisi saw Karim, he quickly diagnosed Karim's pneumothorax, administered oxygen, and sent him to the emergency room in the span of approximately thirty minutes. Karim is unable to point to any evidence in the record of Obaisi's deliberate withholding of necessary medical treatment.

Even if Karim could show that he did not receive the best, fastest medical care possible—which he has failed to do—*Holloway* makes clear that he is not entitled to the best care possible. In fact, even much worse medical treatment than what Karim received does not amount to deliberate indifference. *See, e.g. Duckworth v. Ahmad*, 532 F.3d 675 (7th Cir. 2008) (a doctor who failed to conduct the proper test to diagnose the plaintiff's bladder cancer was not deliberately indifferent despite the resultant delay in diagnosis); *Whiting v. Wexford Health Sources, Inc.*, 181 F.Supp.3d 489, 498 (N.D. Ill. 2015) (a two-month delay in ordering biopsy that resulted in diagnosis of lymphoma and which caused unnecessary pain did not amount to deliberate indifference because the prison doctor's decision not to order a biopsy sooner was not a substantial departure from professional standards).

Karim also claims that Obaisi was deliberately indifferent to Karim's medical problems by not responding to his letter requesting treatment of his chest pain on November 14, 2012. However, the record indicates that Obaisi did not receive or read this letter (or any grievance letters from inmates because nurses were responsible for screening such letters), so he could not have been deliberately indifferent to Karim's medical condition by failing to respond. *See Keller v. Elyea*, 496 F.App'x. 665, 667 (7th Cir. 2012) (upholding summary judgment where the plaintiff failed to provide evidence that the doctor had reviewed the plaintiff's letters); *Sharif v. Carter*, No. 12 C 5685, 2017 WL 3421554, at *11–12 (N.D. Ill. Aug. 8, 2017) (granting summary judgment in favor of Stateville's medical director because it was not her practice to review letters sent by inmates, and she did not read the relevant letter, so she could not have had the knowledge required for a claim of deliberate indifference); *but see Reed v. McBride*, 178 F.3d 849, 854 (7th Cir. 1999) (reversing a grant of summary judgment in favor of prison officials who read grievance letters from the plaintiff but chose not to act in response). In keeping with

the principle that prison officials who are not aware of an inmate's medical problem, especially when there is a policy against them reviewing inmate grievances, do not have the knowledge necessary to be deliberately indifferent, the Court grants Obaisi's motion for summary judgment.

### C. *Monell* Claim Against Wexford

In addition to his claims against the individual defendants, Karim also brings a *Monell* claim against Wexford. To the extent that individual Wexford Defendants remained in the case following summary judgment, the parties have agreed to bifurcate their *Monell* claim from their claims against the individual defendants. (*See* Dkt. Nos. 76, 79.) As held above, Defendant Brooks, a Wexford employee, is not entitled to summary judgment. Due to the bifurcation of his claims, Karim's claim against Wexford is underdeveloped and a final ruling on summary judgment would be premature.

## CONCLUSION

For the reasons set forth above, the Court grants summary judgment to Defendant Johnson, who was accused of being deliberately indifferent to Karim's cell conditions in Count I. The other defendants who were named in Count I, Defendants Jenkins, Hopkins, and Panozzo, have not moved for summary judgment. The Court also grants summary judgment to Defendants Obaisi, Pinas, and Hardy, who were named in Count II, which alleges deliberate indifference to Obaisi's pneumonia and collapsed lung. Defendant Naqpal, who was also named in Count II, withdrew his motion for summary judgment. Finally, the Court grants summary judgment for Defendant Tejrda in Count III, which alleges deliberate indifference to Karim's abscessed tooth, but denies summary as to Defendants Brooks, Mitchell, and Lemke, who are

also named in Count III. Finally, Wexford's Motion for Summary Judgment as to Count IV, a *Monell* claim, is denied without prejudice.


_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois


Date:  September 14, 2017